| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO 1437 Bannock Street, Room 256 Denver, CO 80202 | DATE FILED: April 3, 2019 6:15 PM<br>FILING ID: 3EBD7A17D37DB<br>CASE NUMBER: 2019CV31328 |
| **PLAINTIFFS:** iscene, LLC, Andri Ioannidou and Barbara Monday<br><br>v.<br><br>**DEFENDANTS:** Board of Trustees, Metropolitan State University of Denver and University Corporation for Atmospheric Research Foundation n/k/a UCAR Exchange | ▲ COURT USE ONLY ▲<br><br>_____<br><br>Case No.:<br><br><br>Div. |
| **Attorneys for Plaintiffs:**<br>David R. Eason, No. 11243<br>EASONLAW, LLC<br>1129 Cherokee Street<br>Denver, CO 80204<br>303-381-3400<br>dave@dreasonlaw.com<br><br>Christina A. Fiflis, No. 11901<br>FIFLISLAW, LLC<br>1129 Cherokee Street<br>Denver, CO 80204<br>303-381-3405<br>christinafiflis@mac.com | |
| **COMPLAINT** | |

The Plaintiffs, through their attorneys, complain against the Defendants as follows:

**Parties and Venue**

1. Plaintiff iscene, LLC ("iscene") is a Colorado limited liability company with its principal place of business in the City and County of Denver, Colorado.

2. Plaintiff Andri Ioannidou ("Ioannidou") is an individual residing and doing business in the City and County of Denver, Colorado. Ioannidou is a member of iscene, and was a member of Iscene at all times relevant to the matters, events, transactions and circumstances addressed in this Complaint.

3. Plaintiff Barbara Monday ("Monday") is an individual residing in Boulder County, Colorado and doing business in the City and County of Denver, Colorado. Monday is a member of iscene, and was a member of Iscene at all times relevant to the matters, events, transactions and circumstances addressed in this Complaint.

4. Iscene has no members, managers or employees other than Ioannidou and Monday, and never has had any members, managers or employees other than Ioannidou and Monday.

5. Defendant Board of Trustees, Metropolitan State University of Denver ("MSU") is a body corporate established by Colorado General Assembly (C.R.S. 23-54-101, 102), having its facilities, and conducting its activities and functions, in the City and County of Denver, Colorado. MSU is one of Colorado's larger public universities, having a total enrollment of approximately 20,000 and operating on a budget of approximately $150 million. At all times and with respect to all matters relevant to this Complaint, MSU acted by and through its employees. agents and representatives, including Dr. Janelle Johnson ("Johnson").

6. Defendant University Corporation for Atmospheric Research Foundation n/k/a UCAR Exchange ("UCAR") is a Colorado not for profit corporation with its principal place of business in Boulder County, Colorado and, upon information and belief, doing business in the City and County of Denver, Colorado. At all times and with respect to all matters relevant to this Complaint, UCAR acted by and through its employees. agents and representatives, including Kristen Wegner ("Wegner") and her superior and supervisor Dr. Tony Murphy ("Murphy"), both of whom were associated and worked with UCAR's GLOBE Implementation Office ("GIO"), which administers a community program known as Global Learning and Observations to Benefit the Environment ("GLOBE"). To the extent Murphy was not personally and directly involved in events and communications in which Wegner was involved, addressed in detail below, he received prompt and detailed reports from Wegner concerning those events and communications, and ratified and approved of her actions and conduct.

7. Venue for this action is appropriate in this Court pursuant to C.R.Civ.P. 98 and related law.

**General Allegations**

8. Iscene is an educational technology company employing scientific and technical expertise to create curricula and educational processes geared to improving student outcomes, particularly in the area of STEM (science, technology, engineering and mathematics) education, by employing a proprietary computer-based platform (the "iscene platform") which enables student-centered, project-based collaboration that securely connects users (via internet) across classroom, school, state and national borders. By way of example, the iscene platform has been successfully employed in collaborative projects between students and schools located in Colorado and Nepal through a project funded by the U.S. Department of Education.

9. Since its inception, iscene's business and activity has centered on the application for and performance of grants issued by government agencies involved in educational technology and STEM education. As MSU and UCAR have known at all relevant times, the technology and STEM education community in which iscene, Monday and Ioannidou work is small, closely knit and selective. MSU and UCAR have also known at all relevant times that members of the technology and STEM education community, including the members of the Project's MULTI time and MULTI Advisory Board described and identified below, know of Ioannidou's and

Monday's involvement in and with iscene, and associate and identify iscene with Ioannidou and Monday.

10. Beginning in the Spring of 2015, iscene, through Ioannidou and Monday, began development of a proposal (the "Proposal") for submission to the National Aeronautics and Space Administration ("NASA"), for funding a research project involving the use of the iscene platform to engage upper elementary and middle grade students, and their teachers, in interdisciplinary collaborative STEM studies, thereby increasing awareness and understanding of STEM programs and preparing students for future work within STEM disciplines. As developed, the Proposal contemplated that, as part of their collaborative learning efforts, the students and participating teachers would become familiar with the GLOBE program and would use the iscene platform to access and employ data gathered and stored through the GLOBE program.

11. The Plaintiffs discussed the Proposal with Murphy to determine if the GLOBE program could play the contemplated role. Murphy, who had worked with the Plaintiffs and had developed a professional and collaborative relationship with them, responded positively, suggesting that the Proposal be shared with Johnson at MSU, with the idea that MSU would function as the Proposal's sponsoring institution. Both Murphy and Wegner knew and had previously worked with Johnson.

12. Pursuant to Murphy's suggestion, the Plaintiffs approached Johnson and MSU, offering participation in the Proposal, provided the Plaintiffs would have continued roles as the technology supplier (iscene) and research investigators (Monday and Ioannidou) for the research project should the Proposal be approved and funded by NASA. Agreeing and promising to comply with those conditions, and following further development of the Proposal through efforts in which the Plaintiffs took lead roles, MSU presented the Proposal to NASA as the sponsor institution. NASA declined to review the Proposal, however, because MSU's grant and contract personnel failed to understand that MSU was ineligible for qualifying NASA funding, which ineligibility had not been disclosed to the Plaintiffs.

13. Disappointed, but agreeing to continue their work and efforts with MSU and Johnson based on the foregoing agreements and promises and as Murphy had suggested, iscene, Monday and Ioannidou invested substantial effort in redrafting the Proposal for submission to the National Science Foundation ("NSF") for funding under the NSF's Innovative Technology Experiences for Students and Teachers (ITEST) Program under the title "A Community Based Approach to Engaging Students and Teachers" (the "Project"). As in the case of its submission to NASA, the Proposal, as redrafted for submission to the NSF, contemplated that students and teachers involved in the Project would become familiar with GLOBE and would use the iscene platform to access and employ data gathered and stored by and through GIO and the GLOBE program.

14. The NSF is the nation's premier funding source for scientific and educational research. It administers a budget of $7.5 billion (FY 2017) and provides funding for approximately 24 percent of all federally supported basic research conducted by and through U.S. universities. Its review of project proposals is rigorous and is widely considered the

scientific "gold standard." Proposals are in nearly all cases evaluated by at least three independent reviewers from among a pool of nationally recognized experts and subjected to stringent, merit based standards designed to eliminate projects that are not of the highest caliber.

15. Due to its prominence, competition for NSF awards is intense. Only a fraction of the proposals submitted receive approval, a portion that has declined over time. For example, between 2009 and 2014, NSF's overall approval rate dropped by nearly a third, from 29% to 20%. Obtaining an NSF award is especially difficult for proposals (such as the Proposal) submitted to the Division of Research on Formal and Informal Settings (DRL) within the NSF's Directorate for Education and Human Resources (EHR). In 2013, 1,575 proposals were submitted to the DRL for formal review. Of those, 189 (12%) received an award.

16. As noted above, the Plaintiffs' willingness to work and collaborate with MSU, to continue in those efforts notwithstanding MSU's undisclosed ineligibility for NASA funding, and to submit the Proposal to the NSF with MSU as the sponsor institution, were in all cases predicated on the agreements and promises that iscene's platform would form a centerpiece of the Proposal and (if it were funded) the Project, and that, if the Project were funded, Monday and Ioannidou would serve as Project Co-Principal Investigators ("Co-PIs"), along with Johnson as Project Principal Investigator ("PI"). Absent those agreements and promises, the Plaintiffs would not have agreed to work and collaborate with MSU, or to continue with that work and collaboration after NASA declined to review the Proposal, and would have sought another university or institutional sponsor for the Proposal.

17. At the time, MSU had never qualified for a research project or grant of the type and magnitude represented by the Proposal and the Project. In addition, MSU and Johnson could not have developed or submitted the Proposal on their own because, among other reasons, they did not have or have access to innovative educational technology such as the iscene platform.

18. Aware of the circumstances set forth above, including the NSF's prestige and that the Proposal represented a rare opportunity to obtain a large and prestigious NSF funded research project, MSU readily agreed and promised as the Plaintiffs requested.

19. The Plaintiffs expended approximately 400 hours in developing the Proposal, many of those hours spent in completing tasks Johnson was unable to address due to her relative lack of experience. At the time it was submitted to the NSF in November, 2015, the anticipated funding for the Project exceeded $1 million.

20. The Plaintiffs' capacities and expertise, coupled with the hundreds of hours they dedicated to the design and development of the Proposal, were essential to the Proposal's viability and its ability to withstand and satisfy the NSF's rigorous review and selection process, and to compete and qualify for the few award opportunities available through the DRL. Among other essential contributions, iscene's proprietary technology was central to the Proposal's design and its ability to satisfy the NSF's requirement that the Project focus on student engagement and learning. In addition, iscene, Ioannidou and Monday were critical to obtaining academic support for the Proposal and assembling the Project team and collaborators, including the support and participation of Dr. Clayton Lewis ("Dr. Lewis"), a Fellow of the Institute of Cognitive Science

and President's Teaching Scholar at the University of Colorado Boulder.

21. MSU's contribution to the Proposal was limited to its participation as the sponsor organization and Johnson's background in STEM among underrepresented students.

22. UCAR made no contribution to the Proposal other than to commit personnel and resources to the Project's use of GLOBE data in the event it received NSF funding.

23. Having received early confirmation that NSF's award was probable, iscene, Ioannidou and Monday, with MSU's agreement and at Johnson's request, commenced work on the Project in June and July, 2016, thereby expending additional uncompensated effort, including communications with NSF program officer Dr. Celestine Pea ("Pea") to address feedback received regarding the Proposal and to provide modifications and additional information required to obtain formal NSF approval. As previously, the Plaintiffs took the lead role in those matters due to Johnson's relative inexperience.

24. On September 16, 2016, as a direct result of the Plaintiffs' work and contributions, the Proposal was formally approved and awarded by the NSF. As awarded, the Project commenced October 1, 2016, was to conclude September 30, 2019, and was funded in the amount of $989,533.00 (the "Grant") – one of the largest research grants in MSU's history.

25. As an essential component of the Plaintiffs' agreements with MSU, and as approved by the NSF as part of its formal approval of the Proposal, Ioannidou and Monday were designated as Project Co-PIs. The Co-PI designations could be withdrawn, terminated or modified only by the NSF or with its consent.

26. Designation as a PI or co-PI vests the person so designated with an official status and authority respecting a research project and grant, including control over project development and research objectives. As in other research communities and (as MSU, UCAR and their representatives knew) in the STEM education technology community in which the Plaintiffs work, the designation of a person as PI or co-PI with respect to a research project and grant is understood and viewed as an important and valuable indicator of the person's competence and ability. Similarly (and as MSU and UCAR also knew), the involuntary elimination of a person as a PI or Co-PI with respect to a grant or project is understood and viewed as indicating a lack of competence.

27. Following receipt of the NSF's award, on October 3, 2016, pursuant to their commitments and agreements described above, MSU and iscene concluded a written agreement regarding iscene's performance of certain elements of the Project during the Project's performance period of October 1, 2016 through September 30, 2019 (the "iscene contract"). Consistent with those commitments and agreements, the iscene contract provided iscene would be paid approximately $315,000 for its work during the performance period, leaving approximately $675,000 in Project/Grant funds for MSU and other Project-related uses. The iscene contract incorporated all applicable terms and conditions of MSU's contract with the NSF including, upon information and belief, a requirement that the agreement's termination be based on non-compliance, misconduct or other cause, and included, among other terms, a provision

expressly requiring the parties to engage in efforts to resolve any and all disputes, should the same arise.

28.     UCAR knew of the iscene contract and was aware of its material terms at all relevant times.  Among other things, Murphy was informed of the iscene contract at the time it was made or shortly thereafter, Wenger was informed of the iscene contract in early 2017 and subsequently, personnel at UCAR communicated with iscene concerning the interface between the iscene platform and the GLOBE database, and Wegner and Murphy studied and discussed the terms of the iscene contract in March, 2017, if not before.

29.     At or about the time of the iscene contract, MSU and UCAR entered into a similar contract for the provision of GLOBE training and access as contemplated by the approved Proposal and Project (the "UCAR contract").  The UCAR contract provided for payment to UCAR over the three year Project term of Project/Grant funds totaling approximately $100,000.00.  Nothing in the UCAR contract addressed, explicitly or implicitly, the iscene contract or Monday's and Ioannidou's roles as Co-PIs, or provided that UCAR or any of its employees, agents or representatives would have or exercise any authority, oversight, responsibility or other function with respect to iscene's performance of its contract or Monday's or Ioannidou's performance as Co-PIs, and neither UCAR nor any of its employees, agents or representatives had any other role or status in or with the Project or Grant according them any such authority, oversight, responsibility or function.

30.     It is common and customary in the conduct of a research project to form a participant team for the purpose of project development and coordination.  In such cases, the common and customary understanding and agreement among team members is that they will communicate openly and honestly regarding any matters of concern or disagreement, and will work together collaboratively to resolve concerns or disagreements.  These functions, understandings and agreements are well known in the research community generally and in the STEM/education technology community, members of which, including the Plaintiffs, Johnson, UCAR, Wegner and Murphy, were involved in the Project.

31. At or about the time the iscene contract and the UCAR contract were made, a Project team (known as the "MULTI Team") was formed, consisting of Johnson, Ioannidou, Monday, Wegner and other Project participants.  In accordance with the common and customary model, the purpose and function of the MULTI Team was to coordinate and develop the Project and its component activities, and the Team and its function were based on the understanding and agreement that any matters of concern or disagreement would be communicated frankly and openly, and resolved collaboratively.  To that end, notes were kept of all team meetings on an open platform, allowing all team members, including Wegner and Johnson, to make, add to and comment on discussions occurring at Team meetings and Project concerns.

32.     Following the NSF's formal award, the Plaintiffs fully performed all obligations attending the iscene contract and their Co-PI roles.  In addition, the Plaintiffs, principally Monday and Ioannidou, provided Johnson and MSU with substantial assistance, including with respect to the preparation of research instruments for the Project and work needed to obtain school district approvals for Project research, that went beyond their contractual obligations and

Co-PI roles and properly lay within Johnson's purview as PI. The Plaintiffs provided such assistance at Johnson's request due to her relative inexperience and uncertainty in handling the subject tasks. The Project successfully unfolded and progressed as planned.

33. Following the NSF's formal award, Johnson began to exhibit animosity for the Plaintiffs and insecurity attending her role as PI, treating Monday and Ioannidou in a distant and unfriendly manner, insisting that certain work be done using inefficient and time consuming methods, admitting to insecurities attending her inexperience and abilities, requiring that she be included in communications concerning matters in which she had no competence or input, and giving other indications of dislike. Unbeknownst to the Plaintiffs, Johnson's animosity stemmed in substantial part from her hostility and opposition to the Plaintiffs' efforts to develop iscene as a viable commercial concern – a source of earnings by which Monday and Ioannidou might make a living.

34. In late 2016 or early 2017, Johnson began to share her feelings and views regarding the Plaintiffs with Wegner, subsequently with Murphy.

35. Desiring to reinforce Johnson's feelings and views, to take her side, to gain a larger share of the Project budget for UCAR, and to replace the iscene platform with GLOBE data and teacher training as a centerpiece of the Project, Wegner, with input from Murphy and in coordination with Johnson, fabricated and assisted in fabricating a set of purported problems (hereafter, the "concerns") designed to justify the termination of the iscene contract and the elimination of Monday and Ioannidou as Project Co-PIs. Those "concerns" included: (A) a false report that the Plaintiffs had sought to generate business for themselves through meetings and communications involving UCAR and GLOBE; (B) a false and unfounded suggestion that the iscene platform was not safe or secure for student use; (C) a false claim that the Plaintiffs intended to charge teachers for use of the iscene platform; and (D) a false claim that the Plaintiffs intended to treat the lesson plans and other educational work product developed during the Project as their property. The concerns were concealed from the Plaintiffs. For example, they were not discussed or mentioned in any way at meetings of the MULTI Team, and were not reflected in Team notes or in other written form.

36. Johnson would not, on her own, have engaged in the conduct described in Paragraph 35 above and below without the conduct, advice and assistance of UCAR, through Wegner and Murphy. Among other things, the conduct, advice and assistance of UCAR was essential to the formation and articulation of the concerns, the "talking points" and communications with Pea described below and, ultimately, the termination of the iscene contract and Monday and Ioannidou as Project Co-PIs, described below.

37. By mid-March, 2017, Wegner, Johnson and Murphy had agreed that Wegner and Johnson would contact NSF program officer Pea with a set of "talking points" based on the concerns, designed to alarm Pea and gain her imprimatur for or acquiescence in the elimination of iscene, Monday and Ioannidou. As in the case of the "concerns," the plan to contact Pea and the "talking points" were concealed from the Plaintiffs.

38. Unaware of the concerns and the plan to contact Pea, the Plaintiffs continued

work on the Project, including development of the iscene platform for Project-specific application and substantial assistance to Johnson in the development of applications to be provided school districts to gain permission to conduct research involving students.

39. On March 22, 2017, a MULTI Team meeting was held by telephone. Ongoing Project preparations were discussed in detail, including the use of the iscene platform by students and for data collection and changes that would be required in the platform for the Project's second year. The "concerns" and related "talking points" were not discussed, nor was any mention made of the plan to contact Pea. Following the meeting, Johnson engaged in a jocular text exchange with Ioannidou.

40. Following the March 22 meeting, Johnson, Wegner and Murphy communicated concerning the "talking points," and scheduled a meeting for the morning of March 30, 2017 to review their plan a final time, followed by a call to Pea. Again, the Plaintiffs were not advised of the meeting or the plan to contact Pea.

41. It is highly unusual and a breach of accepted protocol for a project contractor, such as UCAR, to be involved in direct communication with the agency program officer assigned to the project. Communications with the agency program officer are the province of the project PI and Co-PIs.

42. Meeting as scheduled the morning of March 30, 2017, Wegner and Johnson contacted Murphy and reviewed the "talking points" with him. They then contacted Pea, addressing her on a speaker phone while relating the "talking points." Upon information and belief, Pea reacted with some alarm, but informed Johnson and Wegner that the matters raised were MSU's and Johnson's to resolve, not the NSF's. Within minutes following the call with Pea, Johnson and Wegner attended a meeting of the MULTI Team at which Monday and Ioannidou were present. No mention was made of the "talking points" discussion with Murphy or the call to Pea.

43. During the MULTI Team meeting, Pea contacted Johnson, who invited Wegner to join the call. Upon information and belief, Pea again advised that the NSF would leave resolution of the matters raised in the earlier call to MSU and Johnson for resolution. Wegner and Johnson rejoined the meeting, again making no mention of the "talking points" or the communications with Pea.

44. Following the MULTI Team meeting, Johnson and Wegner agreed to portray Pea's statements during their communications as constituting an express directive that iscene's contract be terminated and Monday and Ioannidou be removed as Project Co-PIs. That portrayal was false, and was known to be false by Johnson and Wegner.

45. On March 31, 2017, Wegner sent an email to Murphy and UCAR administrators Katy Lackey and Megan Delaney, advising of the impending termination of the iscene contract and the opportunity that would afford UCAR and its affiliates, including GLOBE U.S. Country Coordinator Jen Borgeault ("Borgeault"), for expanded participation in the Project. Among other opportunities, Wegner estimated UCAR and its affiliates could receive up to an additional

$300,000.00 in Project/Grant funds.

46. As discussed and agreed with Wegner and possibly Murphy as well, on April 3, 2017, Johnson, without any communication with, or notice or forewarning to, iscene, Ioannidou and/or Monday, issued an email to iscene, Monday and Ioannidou (the "April 3 email") asserting that upon a "directive" from its program officer the NSF had "advised" that iscene's participation be immediately terminated due to "concerns" regarding "security and privacy issues" attending the iscene platform, raising "potentially auditable issues" and placing MSU "in danger of having the entire project revoked and being ineligible for future federal funding." As Johnson, Wegner and Murphy knew, in the technology and STEM education community "concerns" regarding "security and privacy issues" are equivalent to an assertion that a platform is insecure and subject to unauthorized access and the compromise of sensitive personal and confidential information, making it wholly unsuitable for use, and in fact dangerous to students and other users.

47. As Johnson, Wegner and Murphy also knew, the statements in the April 3 email were entirely false and unfounded. Pea had issued no such "directive," had provided no such "advice," and had expressed no such "concerns." Further, there were no "security and privacy issues" attending the iscene platform, no "potentially auditable issues," and no "danger" the Project might be revoked and MSU made ineligible for federal funding. The false statements in the April 3 email were made for the purpose of creating a basis for the termination of the iscene contract and eliminating Monday and Ioannidou as Project Co-PIs.

48. On April 4, 2017, and again as discussed and agreed with Wegner and possibly Murphy, Johnson issued a second and third email (collectively, the "April 4 emails"), the first addressed to the ten members of the MULTI Team, the second addressed to the Project's MULTI Advisory Board (Dr. Lewis, Dr. Robert (Bud) Talbot of the University of Colorado Denver, Dewey Brigham (the President of the Colorado Association of Black Professional Engineers and Scientists), and Stephanie Veck (the Director of the Colorado Workforce Development Council)), stating in both that the NSF had issued a "directive" to "terminate" iscene "due to compliance issues." The email addressed to the Advisory Board was carbon copied to Wegner and Murphy, neither of whom was a member of the Board.

49. As Wegner, Johnson and Murphy knew, "compliance issues" are, in the technology and STEM education community, synonymous with "security and privacy issues" and, as noted above, denote a person's or platform's failure to adequately safeguard student data, including personal information, with attendant dangers. Such an assertion is fatal to the use and acceptance of a platform and highly damaging to the professional and business reputations of the persons involved in its creation and design. Johnson's April 4 emails underscored the gravity of the circumstances they described by recognizing that recipients might wish to reconsider their participation in the Project.

50. As in the case of the April 3 email, the statements made in the April 4 emails were entirely false, known by Johnson. Wegner and Murphy to be false, and made for the purpose of justifying the termination of the iscene contract and the participation of Monday and Ioannidou as Project Co-PIs, and deflecting and placing the responsibility and potential blame for the situation on Pea and the NSF.

51. Following receipt, iscene, Monday and Ioannidou responded to the April 3 and 4 emails, immediately denying their truth, and requesting explanation from Johnson and MSU and that they provide any available substantiation for the statements made. Johnson and MSU ignored those requests.

52. In a series of email communications with Dr. Lewis on April 4 and 6, 2017, Johnson repeated the false assertions that the NSF had demanded iscene's immediate removal from the Project due to privacy and security concerns, adding false statements, including that the demand had come directly from Pea, was "not up for discussion," and that Johnson was at "a loss to provide any other information" because none was available to her.

53. Receiving no response from Johnson and MSU, the Plaintiffs reached out to others involved in the Project, including Murphy. In a series of emails on April 5, 2017 between and among Johnson, Murphy and Wegner, it was agreed Murphy would only respond by reiterating the false statements contained in the April 4 emails, and would take the position that UCAR and GLOBE had no interest in the matter. In those same emails, Murphy and Johnson discussed moving a portion of the Project to Borgeault through a contract with her institution, the University of New Hampshire.

54. On April 10, 2017, MSU formally terminated iscene's agreement through a letter (the "April 10 letter") from Stacey Steelman, an officer of the Auraria Higher Education Center acting for MSU. In addition to basing termination on falsehoods contained in the April 3 and 4 emails, the letter falsely asserted that the iscene platform "was only for students, not teachers," and that iscene "was found to be pursuing funds in the name of the grant without notifying [Dr. Johnson]." Again, iscene, Monday and Ioannidou denied those assertions, demanding explanation and proof. No response was received. Additional demands for proof and explanation went unanswered.

55. The Plaintiffs received no response or explanation from Murphy, Wegner or others at UCAR, and Murphy ceased all association and contact with them. The roles and conduct of UCAR, Murphy and Wegner in the matters described herein were concealed from the Plaintiffs until recently, when they were revealed through formal discovery conducted in a previous action against MSU and Johnson.

56. iscene's termination freed over $250,000 in Project funding for reallocation to other uses and recipients. MSU and its constituents were substantial beneficiaries of the reallocated funds, including through increases to the salary of Dr. Rich Wagner (appointed as Co-PI to replace Monday and Ioannidou), compensated employment of additional MSU faculty on the Project, and the contribution of additional funds to pay MSU employee Linda Sivertson in her role as MSU Project manager. UCAR benefitted as well, with Borgeault and her institution receiving a contract award of approximately $38,000.00. In addition, and as a direct benefit to UCAR, the entire focus of the Project switched from what the NSF had approved (student collaboration on STEM projects using the iscene platform) to the training of teachers in the use of GLOBE data and associated tools and their recruitment as GLOBE teachers and partners. To disguise that switch, Johnson submitted a misleading annual report to the NSF, falsely claiming that the Project would continue to involve student online collaboration when, in fact, it would

not.

57. The Plaintiffs have been gravely injured by the foregoing conduct through violation of their contracted and promised rights and status, loss of the value of their work and efforts, injury to their standing and reputation and resulting loss of opportunities for work and employment, and otherwise. Iscene has been unable to attract work or employment and has suspended its operations, effectively going out of business. Monday and Ioannidou have lost grant opportunities and opportunities for employment within their chosen fields.

58. Any and all conditions to the initiation of this action have been satisfied.

### First Claim for Relief
### (Breach of Contract – Iscene – Against MSU)

59. The allegations set forth in Paragraphs 1 though and including 58 are expressly incorporated by this reference.

60. iscene contracted with MSU to perform services and functions in connection with the Proposal, the Project and the Grant for a definite term and at a definite price.

61. MSU has breached the contract, including its implied covenant of good faith and fair dealing, through the conduct complained of herein, including by failing to address or resolve disputes as required and by terminating the contract on false and concocted grounds.

62. MSU's breach has caused iscene damages in amounts to be proved at trial.

### Second Claim for Relief
### (Breach of Contract – Ioannidou and Monday – Against MSU)

63. The allegations set forth in Paragraphs 1 though and including 62 are expressly incorporated by this reference.

64. Monday and Ioannidou had contracts with MSU to serve as co-PIs of the Project during its term, subject to the NSF's consent to their appointment as such.

65. The NSF consented to the appointment, thereby satisfying the contract's condition.

66. MSU breached the contract, including its implied covenant of good faith and fair dealing, by eliminating Monday and Ioannidou without the NSF's consent and/or by obtaining such consent on false and concocted grounds.

67. MSU's breach has caused Monday and Ioannidou damages, including non-economic damages, in amounts to be proved at trial.

### Third Claim for Relief
### (Promissory Estoppel Against MSU)

68. The allegations set forth in Paragraphs 1 though and including 67 are expressly incorporated by this reference.

69. MSU made promises to the Plaintiffs, including that they would have continuing roles in the Project as its technology supplier and as research investigators in the event the Proposal was approved and received funding.

70. MSU knew and should reasonably have expected that its promises would induce action by the Plaintiffs, including the devotion of substantial time and effort to the Proposal and its approval, and thereafter to the Project.

71. The Plaintiffs reasonably relied on MSU's promises to their detriment.

72. MSU has breached its promises and they should be enforced to prevent injustice. The Plaintiffs are entitled to such remedies as justice requires.

### Fourth Claim for Relief
### (Unjust Enrichment Against MSU)

73. The allegations set forth in Paragraphs 1 though and including 72 are expressly incorporated by this reference.

74. At the expense of iscene, Monday and Ioannidou, MSU has received benefits under circumstances making it unjust that it retain the benefits without paying therefor.

75. iscene, Monday and Ioannidou are entitled to restitution and appropriate supplemental remedies in amounts and types to be proved at trial.

### Fifth Claim for Relief
### (Intentional Interference with Contract Against UCAR)

76. The allegations set forth in Paragraphs 1 though and including 75 are expressly incorporated by this reference.

77. The Plaintiffs had contracts with MSU as set forth and described herein.

78. UCAR knew of the contracts or reasonably should have known of them.

79. UCAR, by words and conduct intentionally caused and induced MSU to terminate the contracts and/or not to perform them, and/or interfered with MSU's performance of the contracts, thereby causing MSU not to perform and to terminate the contracts.

80. UCAR's interference was improper.

81. The Plaintiffs have suffered losses and damages as a result in amounts to be proved at trial.

### Sixth Claim for Relief
**(Intentional Interference with Prospective Business Advantage Against UCAR)**

82. The allegations set forth in Paragraphs 1 though and including 81 are expressly incorporated by this reference.

83. The Plaintiffs had prospective contractual and/or business and economic relations with MSU and others.

84. UCAR knew or reasonably should have known of those relationships and, by words and conduct, intentionally induced or otherwise caused MSU not to enter into or continue the prospective relations, and/or prevented the Plaintiffs and MSU from continuing the prospective relations.

85. UCAR's interference and inducement was improper.

86. The Plaintiffs have suffered losses and damages as a result in amounts to be proved at trial.

WHEREFORE, Plaintiffs request that the Court enter judgment in their favor and against Defendants MSU and UCAR for the damages and recoveries set forth above, including pre- and post-judgment interest thereon, awarding their fees and costs incurred in the prosecution of this action, including reasonable attorneys' fees, and granting them such other and additional damages and relief as may be just and appropriate.

Dated this 3rd day of April, 2019.

EASONLAW, LLC

*s/ David R. Eason*
David R. Eason

FIFLISLAW, LLC

*s/ Christina A. Fiflis*
Christina A. Fiflis

Plaintiffs' address:
2532 N. Vine St.
Denver CO 80205