**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 20-cv-0365-WJM-SKC

ISCENE, LLC,
ANDRI IOANNIDOU, and
BARBARA MONDAY,

    Plaintiffs,

v.

BOARD OF TRUSTEES, METROPOLITAN STATE UNIVERSITY OF DENVER,
UNIVERSITY CORPORATION FOR ATMOSPHERIC RESEARCH, and
JANELLE M. JOHNSON

    Defendants.

---

**ORDER GRANTING PLAINTIFFS' MOTION TO REMAND ACTION OR
DECLINE SUPPLEMENTAL JURISDICTION**

---

This dispute regarding Plaintiffs iscene, LLC, Andri Ioannidou, and Barbara Monday's (collectively, "Plaintiffs") termination from a National Science Foundation ("NSF") project is before the Court on Plaintiffs' Motion to Remand Action or Decline Supplemental Jurisdiction ("Motion to Remand").  (ECF No. 28.)  Defendants Board of Trustees, Metropolitan State University of Denver ("MSU"), University Corporation for Atmospheric Research ("UCAR"), and Janelle M. Johnson (collectively, "Defendants") responded in opposition (ECF Nos. 43–45), and Plaintiffs replied (ECF No. 50).

**I. BACKGROUND AND PROCEDURAL HISTORY**[1]

Ioannidou and Monday are the sole members of iscene, LLC, an educational

---

[1] The following factual summary is drawn from Plaintiffs' First Amended and Supplemental Complaint ("FASC") (ECF No. 6), except where otherwise stated.

technology company that employs scientific and technical expertise to create curricula and educational processes to improve student outcomes in STEM education. (¶¶ 1–4, 9.)[2] To do so, iscene uses a proprietary computer-based platform that enables student-centered, project-based collaboration and securely connects users. (¶ 9.)

In the spring of 2015, Plaintiffs, in conjunction with MSU and Janelle M. Johnson, an assistant professor at MSU, applied for a NSF grant to fund a research project (the "Project") under the NSF's Innovation Technology Experiences for Students and Teachers Program. (¶¶ 13, 14.) UCAR committed personnel and resources to the Project's use of data if it received funding. (¶ 23.) In September 2016, the NSF awarded them a $989,533 grant, with Johnson serving as a Project Principal Investigator ("PI") and Plaintiffs serving as Project Co-PIs. (¶¶ 17, 25.)

In October 2016, MSU and iscene entered into a written agreement regarding iscene's performance of certain elements of the Project. (¶ 28.) Around the time of the iscene contract, MSU and UCAR entered into a written agreement for the provision of training and access by an entity called Global Learning and Observations to Benefit the Environment ("GLOBE"), as contemplated by the proposal and the Project. (¶¶ 6, 30.) Around the time the parties signed these contracts, they formed a Project team ("MULTI") consisting of Johnson, Ioannidou, Monday, Kristen Wegner (a UCAR employee), and other Project participants. (¶¶ 6, 32.) The MULTI team's purpose was to coordinate and develop the Project. (*Id.*)

After obtaining the NSF award, Johnson began to exhibit animosity toward

---

[2] Citations to paragraph numbers, without more, *e.g.* (¶ __), are citations to the FASC. (ECF No. 6.)

Plaintiffs and insecurity in her role as PI, treating Ioannidou and Monday in a "distant and unfriendly manner, insisting that certain work be done using inefficient and time consuming methods, admitting to insecurities attending her inexperience and abilities, requiring that she be included in communications concerning matters in which she had no competence or input, and giving other indications of dislike." (¶ 34.)  Unbeknownst to Plaintiffs, "Johnson's animosity stemmed in substantial part from her hostility and opposition to the Plaintiffs' efforts to develop iscene as a viable commercial concern. . . ." (*Id.*)  In late 2016 or early 2017, Johnson began sharing these feelings with Wegner and Wegner's supervisor at UCAR, Dr. Tony Murphy.  (¶¶ 6, 35.)  Johnson, Wegner, and in part, Murphy, fabricated a set of purported problems or concerns designed to justify terminating the iscene contract and eliminating Ioannidou and Monday as Co-PIs.  (¶ 36.)  The concerns included

> (A) a false report that the Plaintiffs had sought to generate business for themselves through meetings and communications involving UCAR and GLOBE; (B) a false and unfounded suggestion that the iscene platform was not safe or secure for student use; (C) a false claim that the Plaintiffs intended to charge teachers for use of the iscene platform; and (D) a false claim that the Plaintiffs intended to treat the lesson plans and other educational work product developed during the Project as their property.

(*Id.*)  However, Johnson, Wegner, and Murphy did not discuss these concerns with Plaintiffs.  (*Id.*)

Around mid-March 2017, without informing Plaintiffs, Johnson, Wegner, and Murphy planned to contact Dr. Celestine Pea, the NSF program officer, regarding their concerns.  (¶ 38.)  Johnson and Wegner communicated via text message regarding the plan to remove Plaintiffs from the Project, expressing "delight at the prospect."  (¶ 41.)

3

Johnson and Wegner contacted Pea regarding their concerns and were told these matters were MSU and Johnson's issues to resolve, not the NSF's. (¶ 43.) Johnson and Wegner texted each other that Monday was "bipolar" and "coo," and agreed to portray Pea's statements as constituting an express directive that iscene's contract be terminated and Ioannidou and Monday removed as Co-PIs, though they knew such a portrayal was false. (¶ 45.) Additionally, Johnson and Wegner texted each other regarding transferring the Project from iscene to UCAR. (¶ 46.)

On April 3, 2017, Johnson e-mailed Plaintiffs and stated that "upon a 'directive' from its program officer the NSF had 'advised' that iscene's participation be immediately terminated due to 'concerns' regarding 'security and privacy issues' attending the iscene platform, raising 'potentially auditable issues' and placing MSU 'in danger of having the entire project revoked and being ineligible for future federal funding.'" (¶ 47.) Johnson, Wegner, and Murphy knew the statements in the April 3 e-mail were false and a pretext for terminating the iscene contract. (¶ 48.)

On April 4, 2017, Johnson e-mailed members of the MULTI team, MULTI's Advisory Board, and various other individuals and stated that "the NSF had issued a 'directive' to 'terminate' iscene 'due to compliance issues.'" (¶ 50.) "Compliance issues" are synonymous with "security and privacy issues" in the technology and STEM education community, and denote a failure to adequately safeguard student data, including personal information, with attendant dangers. (¶ 51.) According to Plaintiffs, an assertion concerning a project's "compliance issues" is fatal to the use and acceptance of a platform and damaging to the professional and business reputations of those involved in its creation and design. (*Id.*) Ioannidou and Monday responded to

the April 3 and 4 emails, denying their truth and requesting an explanation from Johnson and MSU; Johnson and MSU ignored the request. (¶ 54.)

On April 10, 2017, MSU terminated iscene's contract, relying on the April 3 and 4 e-mails, as well as the assertion that the iscene platform was only for students, not teachers, and that iscene was pursuing funds in the name of the grant without notifying Johnson. (¶ 58.) Ioannidou and Monday denied the assertions and demanded an explanation, to no avail. (*Id.*) Iscene's termination from the Project freed over $250,000 in Project funding for reallocation to other users and recipients, and in particular, MSU and UCAR benefitted. (¶ 61.) By contrast, Plaintiffs were injured by the aforementioned conduct through "violation of the contracted and promised rights and status, loss of the value of their work and efforts, injury to their standing and reputation and resulting loss of opportunities for work and employment, and otherwise." (¶ 62.) In addition, iscene has been unable to attract work or employment and has effectively gone out of business. (*Id.*) Ioannidou and Monday have lost grant opportunities and employment opportunities in their chosen fields. (*Id.*)

In 2018, Plaintiffs sued MSU and Johnson in state court in *iscene, LLC, et al. v. Board of Trustees, Metropolitan State University of Denver, et al.*, Case No. 18cv031143 ("Case One"). (¶ 63.) In Case One, Plaintiffs asserted various contract claims against MSU and defamation claims against Johnson based on her statements to the MULTI team, the MULTI Advisory Board, the NSF, and others. (¶ 65; ECF No. 28 at 1.) Throughout Case One, which included discovery and a March 2019 hearing conducted pursuant to *Trinity Broadcasting of Den., Inc. v. City of Westminster*, 848

5

P.2d 916 (Colo. 1993), Johnson withheld and concealed the text messages described in the FASC. (¶ 64.) Johnson invoked her status a public employee and the rights afforded to her under the Colorado Governmental Immunity Act, and acting through the office of Colorado's Attorney General, withheld and concealed the text messages and the communications comprising them. (¶ 65.) According to Plaintiffs, she did so to

> frustrate and impair the Plaintiffs' efforts to establish the basis for their claims against her, to mislead the Plaintiffs and the Court regarding her motives, the reasons for the Plaintiffs' termination, her attitudes towards them, and her awareness of the risks posed and injuries caused by the statements forming the basis for the Plaintiffs' defamation claims, to enable her to offer false testimony concerning such matters, both in her deposition and at *Trinity* hearing, and to prevent the Plaintiffs from effectively challenging that testimony.

(*Id.*)

Both before and after the Case One *Trinity* hearing, Johnson, acting through officers of the Attorney General, threatened to seek "quite substantial" attorneys' fees against Plaintiffs if the court determined that Plaintiffs failed to establish that she had acted "wantonly and willfully." (¶ 67.) Although Plaintiffs objected to the threat because their claims were meritorious and because an award of substantial fees would violate their rights of petition under the United States Constitution and Colorado Constitution, they lacked the wherewithal to fully litigate the matter and could not accept the risk that they would be bankrupted by a fee award. (*Id.*) Accordingly, on April 4, 2019, Plaintiffs dismissed Case One without prejudice. (*Id.*)

On April 3, 2019,[3] Plaintiffs filed another action in the District Court, City and County of Denver, Colorado, against MSU and UCAR ("Case Two"), asserting various contract claims against the defendants. (ECF No. 1-1; ECF No. 28 at 1.) UCAR produced the aforementioned text messages involving Johnson in Case Two on December 11, 2019. (¶ 66.) Concluding the texts demonstrated Johnson's active malice (ECF No. 28 at 2), Plaintiffs impled Johnson, asserting against her, among other claims, a claim for defamation (¶¶ 106–09) and a claim under 42 U.S.C. § 1983 ("§ 1983"), which invoked Plaintiffs' right to petition the Court for redress of grievances arising from the conduct of public agents and employees under the United States Constitution, including its Privileges and Immunities Clause of Article IV, its First Amendment Petition Clause, its Fifth Amendment Due Process Clause, and its Fourteenth Amendment Equal Protection and Due Process Clauses (¶¶ 110–17).

Johnson removed Case Two on February 12, 2020 under the Court's federal question jurisdiction, 28 U.S.C. § 1331. (ECF No. 1 at 4.) The Notice of Removal avers that "All Defendants consent to removal," though it is only signed by Johnson. (*Id.* at 1, 4, 5.) On March 13, 2020, Plaintiffs filed the Motion to Remand, which is ripe for review.

## II. ANALYSIS

In the FASC, Plaintiffs bring a defamation claim (¶¶106–09) and a § 1983 claim for denial of access to courts (¶¶ 110–17) against Johnson. In the access-to-courts

---

[3] It is unclear whether the dates of dismissal of Case One and the filing Case Two are accurate. The FASC alleges Plaintiffs dismissed Case One on April 4, 2019. (¶ 67.) The original complaint in Case Two was filed April 3, 2019. (ECF No. 1-1.)

claim, Plaintiffs allege that

> Johnson deprived the Plaintiffs of their rights to petition this Court for the redress in Case One by withholding and concealing evidence material to their claims against her, by testifying falsely, and by threatening the Plaintiffs with an award of attorneys' fees that would have caused, or at a minimum threatened, their bankruptcy in the event the Court did not rule in their favor.

(¶ 116.) Allegedly, Johnson withheld communications exchanged in connection with Plaintiffs' termination from the Project that Plaintiffs contend would have been relevant to their defamation claim in Case One to show the willful and wanton nature of her conduct. Plaintiffs contend her actions thus prevented their access-to-court for their defamation claim.

In the Motion to Remand, Plaintiffs argue the Court lacks subject-matter jurisdiction because their access-to-courts claim—Johnson's basis for removal under the Court's federal question jurisdiction—is not ripe. (ECF No. 28 at 6–11.) Plaintiffs assert that the § 1983 claim, known as a backward-looking access-to-courts claim, is premised on a denial of their rights of petition and access guaranteed by the United States Constitution and does not arise until they have established that an "arguable" underlying claim has been lost as a result of the offending conduct. (*Id.* at 7 (quoting *Christopher v. Harbury*, 536 U.S. 403, 415 (2002).) Plaintiffs contend they have addressed this requirement because the access-to-courts claim is pled solely in the alternative and in the event their defamation claim is held foreclosed. (*Id.* at 7–8 (citing ¶¶ 111–12, 119–20).) Such foreclosure of the defamation claim would only occur through operation of Colorado's statute of limitations (*id.* at 8); Johnson has raised a

statute of limitations argument in a pending Motion to Dismiss (ECF No. 24 at 9–10).[4] In other words, the federal claim upon which removal is based is not currently actionable—and may never be actionable—unless it is determined that Plaintiffs cannot proceed with their defamation claim. (ECF No. 28 at 8.) Because the Court has no subject-matter jurisdiction over unripe claims, Plaintiffs argue remand is required. (*Id.* at 6–11.)

In response, Defendants argue that Plaintiffs "misinterpret the ripeness doctrine" and contend that the access-to-courts claim is ripe because it is pled in the alternative to the defamation claim.[5] (ECF No. 43 at 7; ECF No. 44 at 2, 6–7; ECF No. 45 at 2.) According to UCAR, it does not matter that Plaintiffs pled their federal claim in the alternative, nor does it matter that they assert the federal claim is not ripe; Plaintiffs assert a federal claim, and thus, the Court has subject-matter jurisdiction. (ECF No. 44 at 6.)

Further, Defendants contend that regardless of whether any of Plaintiffs' claims survive on the merits, their access-to-courts claim presents an issue that does not depend on the occurrence or non-occurrence of any future events. (ECF No. 43 at 7.) The basis of the access-to-courts claim is that Johnson improperly withheld evidence, falsified her testimony, and made threats that she would seek attorneys' fees through statements made by her counsel in the past. (*Id.*) The fact that Plaintiffs assert the

---

[4] Plaintiffs contest that the defamation claim is barred by the statute of limitations but argue that their position on the merits of Johnson's statute of limitations defense is irrelevant to the analysis of whether the access-to-courts claim is ripe. (ECF No. 28 at 8.)

[5] Johnson joins in and adopts the responses filed by MSU and UCAR. (ECF No. 43 at 10.) UCAR joins in and adopts the responses filed by Johnson and MSU. (ECF No. 44 at 7.)

access-to-courts claim in the alternative to the defamation claim is "beside the point for purposes of analyzing ripeness." (*Id.*)

Defendants invoke Federal Rule of Civil Procedure 8(e)(2)[6] and cases which they claim support the proposition that "[s]imply because the outcome of one claim is contingent upon the outcome of another claim in the case does not mean that the first claim cannot be alleged or that the first claim is not ripe." (*Id.* (quoting *Dimensional Music Publ'g, LLC v. Kersey*, 448 F. Supp. 2d 643, 653 (E.D. Pa. 2006) (citation omitted); *RCI Entm't (San Antonio), Inc. v. City of San Antonio*, 2006 U.S. Dist. LEXIS 45063 at * 7 (W.D. Tex. 2006)).)  Defendants argue that while Johnson has a defense to the access claim—that it lacks merit—that defense does not divest the Court of jurisdiction.  (ECF No. 45 at 2.)  MSU also notes that Plaintiffs' defamation claim is legally distinct from, and consists of separate elements than, the access-to-courts claim.  (*Id.*)

---

[6] There is no Rule 8(e)(2) in the current version of the Federal Rules of Civil Procedure. The Court notes that Rule 8 does provide for pleading in the alternative:

> (d) Pleading to Be Concise and Direct; Alternative Statements; Inconsistency.
>
> (1) In General. Each allegation must be simple, concise, and direct. No technical form is required.
>
> (2) Alternative Statements of a Claim or Defense. A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.
>
> (3) Inconsistent Claims or Defenses. A party may state as many separate claims or defenses as it has, regardless of consistency.

Fed. R. Civ. P. 8(d).

Included within the First Amendment right to petition the government is a right of access to the courts. *See Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) ("The right of access to the courts is indeed but one aspect of the right of petition."). Claims for denial of access to the courts may take two forms: "forward-looking" or "backward-looking." This action concerns a "backward-looking claim," a claim that stems from the loss of a meritorious suit that cannot now be tried because of the interference of government officials. *Christopher v. Harbury*, 536 U.S. 403, 412–16 (2002). "Backward-looking" claims are those "in aid . . . of specific cases that cannot now be tried (or tried with all material evidence). . . ." *Id.* at 413–14. "The official acts . . . may allegedly have caused the loss or inadequate settlement of a meritorious case. . . . These cases do not look forward to a class of future litigation, but backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable." *Id.* at 414.

The plaintiff must also show that a "distinct and palpable" injury resulted from the defendant's conduct. *Coit v. Zavaras*, 2013 WL 3448340, at *8 (D. Colo. July 9, 2013) (quoting *Wardell v. Duncan*, 470 F.3d 954, 959 (10th Cir. 2006)). "Generally, a plaintiff bringing an access-to-courts claim hasn't been injured until a court dismisses the underlying claim that is the subject of the alleged interference." *Voss v. Carr*, 2019 WL 5802556, at *2 (W.D. Wis. Nov. 7, 2019); *see also Parrish v. Solis,* 2014 WL 1921154, at *11 (N.D. Cal. May 13, 2014) ("To satisfy the actual injury requirement, a plaintiff must allege facts showing that he or she could not present a claim to the courts because of the Defendants' failure to fulfill their constitutional obligations." (citation,

quotation marks, and alterations omitted)); *Lynch v. Barrett,* 2010 WL 3938359, at *6 (D. Colo. Oct. 5, 2010) ("Plaintiff's injury is contingent on the success (or lack thereof) of his excessive force claim.").

At this stage of the litigation, no court has foreclosed Plaintiffs' defamation claim against Johnson on a statute of limitations or any other basis. *See Parrish*, 2014 WL 1921154, at *13 ("Plaintiff has failed to allege or show the loss of his underlying Eighth Amendment claim. Indeed, Plaintiff cannot allege the 'loss' of this claim at this point in time because litigation of that claim is still pending in this very Court. This leads to the conclusion not only that Plaintiff cannot allege an actual injury for purposes of standing, but that his claim is premature and not ripe for adjudication."). Instead, Plaintiffs' injury is contingent on the success or failure of their defamation claim. As a result, Plaintiffs have "yet to experience a concrete injury, or denial of meaningful relief, and therefore, [their] access-to-courts claim is unripe." *Lynch*, 2010 WL 3938359, at *6.

To the extent Defendants argue Plaintiffs have merely alleged alternative claims, which is permissible under Rule 8, their argument is unavailing. The court rejected this very argument in *Lynch*. *See id.* There, a plaintiff objected to a recommendation that his access-to-courts claim was unripe and should thus be dismissed by arguing that his excessive force claim and access-to-courts claim were brought under Rule 8(d)(2) as alternative statements of a claim. *Id.* In overruling the objection, the court found that the plaintiff

> cannot assert an insufficient claim, even if it is in the alternative. "Rule 8 [only] allows alternative claims to be plead if all of the claims are sufficient on their own." *Sheinman Provisions, Inc. v. Nat'l Deli, LLC*, No. 08–vc–453,

12

> 2008 WL 2758029 (E.D. Pa. July 15, 2008), at *4. Plaintiff's access-to-courts claim is not sufficient, because it does not allege that a specific injury has already occurred.

*Id.* Ultimately, the court held that the plaintiff "has not yet experienced a requisite access-to-courts injury, and thus, the claim is not ripe for review." *Id.* at *7 (adopting recommendation to dismiss access-to-courts claim without prejudice).

Here, like in *Lynch*, Plaintiffs' access-to-courts claim is not sufficient on its own because it does not allege a specific injury has already occurred. *Only* if the defamation claim is foreclosed to them will Plaintiffs incur an injury. Plaintiffs are therefore correct that their access-to-courts claim is simply not ripe for the Court's review at this time.

Federal district courts are courts of limited jurisdiction, and may hear only those cases authorized by a federal statute or the United States Constitution. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A court is required to strictly construe the removal statute in favor of remand and against removal. 28 U.S.C. § 1447. When there is no subject-matter jurisdiction, remand is mandatory. *Id.* § 1447(c).

Here, Plaintiffs access-to-courts claim is the only federal question in the case, and the basis upon which Johnson removed the action to federal court.[7] (*See* ECF Nos. 1, 6.) Because the access-to-courts claim is not yet ripe, this Court does not have subject-matter jurisdiction in this case. Given that this Court's removal jurisdiction is

---

[7] The remaining claims arise under state law: breach of contract, promissory estoppel, unjust enrichment, intentional interference with contract, intentional interference with prospective business advantage, and defamation. (¶¶ 69–109.)

13

based solely on the presence of a federal question, the Court must grant the Plaintiffs' motion to remand.[8]  *See, e.g.*, *Milliken v. Town of Addison*, 2002 WL 31059802, at *1 (N.D. Tex. Sept. 13, 2002) (granting motion to remand where a plaintiff's federal takings claim was not yet ripe and the court's removal jurisdiction was based solely on the presence of a federal question).

### III. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Plaintiffs' Motion to Remand Action or Decline Supplemental Jurisdiction (ECF No. 28) is GRANTED; and

2. The Clerk shall REMAND this case to Denver County District Court, and shall terminate this action.

Dated this 30th day of September, 2020.

BY THE COURT:

William J. Martinez
United States District Judge

---

[8] Because the Court has determined remand is appropriate on the aforementioned basis, it need not separately address Plaintiffs' other arguments that removal was improper because Defendants did not provide sufficient consent to remove or that the Court should decline to exercise supplemental jurisdiction.  (*See* ECF No. 28.)